## O'BRIEN v. BENNETT.

(Supreme Court, Appellate Division, Third Department. May 7, 1902.)

1. LIBELOUS PUBLICATION.

A publication commencing, "Arrested with Her Acquaintance. Mrs. O. and Her Companion [plaintiff] Taken into Custody When She Kept His Change. Fake $100 Bill for Drink. They Had Met on the Train and Become Separated from Her Woman Relative and Children. Husband's Faith in Her,"—and then telling more in detail the story of plaintiff's arrest with a married woman at a public resort, referring to plaintiff by name,—was libelous.

2. SAME—PRESUMPTION OF MALICE.

Malice is presumed in the publication of an article respecting a party which tends to expose him to contempt and ridicule.

3. SAME—EVIDENCE—ADMISSIBILITY.

In an action against defendant for publishing an article stating that plaintiff had been arrested with a married woman at Coney Island, etc., it was error to permit plaintiff to show that thereafter, on a certain occasion, a third party had accused him of being arrested at Coney Island with a prostitute, and that for the purpose of proving his statement he had produced the paper containing the article in question.

Appeal from trial term.

Action for libel by Smith O'Brien against James Gordon Bennett. From a judgment for plaintiff and from an order denying a new trial defendant appeals. Reversed. See 69 N. Y. Supp. 298.

The alleged libel is as follows:

"Arrested with Her Acquaintance. Mrs. Cook and Her Companion Taken into Custody When She Kept His Change. Fake $100 Bill for Drink. They Had Met on the Train and Become Separated from Her Woman Relative and Children. Husband's Faith in Her.

"At Coney Island yesterday afternoon a man who said he was Smith O'Brien, of Albany, N. Y., was arrested. With him, at the time of his arrest, was a woman, who described herself as Mrs. Amelia Cook, of No. 185 Guernsey street, Brooklyn. The man had a large sum of money with him and had been buying drinks with great freedom for Mrs. Cook. In payment for one round of drinks he gave a one hundred bill. When the waiter returned with the change the Cook woman, it is said, took the money. It was then that Thomas Meyers called the attention of a policeman at the pavilion to the couple. Both were taken to the Coney Island police station. Mrs. Cook explained that she and her sister, with two young children of the latter, had met O'Brien on the train and had entered into conversation with him. On the trip from Brooklyn to Coney Island his hat fell off, and Mrs. Cook showed him where he could buy another.

### "She Meant to Prevent Robbery.

"The party then strolled to the seashore. Mrs. Cook's sister and children went in bathing, leaving O'Brien and Mrs. Cook on the beach. Mrs. Cook admits taking O'Brien's money, but said she did so in order to prevent the waiters from robbing the man. She wept when taken to the police station, and told her story between her sobs, and said she was the wife of a respectable man. Mrs. Cook lives at No. 127 Oak street, Greenpoint, with her husband, who is an electrician. He married his wife two years ago in Buffalo. They came to New York two months ago. He was astonished when I told him last night that his wife had been arrested, and said he was sure she would not do anything that would warrant her being taken into custody. He started for Coney Island with a bondsman to procure her release. He was to have met his wife at Coney Island if he got through work at 4 o'clock yesterday afternoon. He did not get through at that hour.

### "Says He Followed Them.

"Mrs. Eberle, of No. 185 Guernsey street, is Mrs. Cook's cousin. She said: 'My little daughter and I went with Amelia to-day. A man lost his hat on the car. He had been drinking, and all the passengers laughed at him. He asked me where he could get a new hat, and I told him there were hat stores at Coney Island. He followed us all day, and we took a drink with him to get rid of him. My daughter and I went bathing, while Amelia stood on the beach. We could not find her when we had finished bathing. I have her pocketbook and I have been very anxious about her all the evening.'"

Argued before PARKER, P. J., and KELLOGG, SMITH, CHASE, and FURSMAN, JJ.

Robert W. Chandler, for appellant.

J. Newton Fiero, for respondent.

FURSMAN, J.  A libel has been defined to be "a censorious or ridiculing writing, picture, or sign, made with a mischievous and malicious intent towards government, magistrates, or individuals."  People v. Croswell, 3 Johns. Cas. 353.  "A libel is a malicious publication tending either to blacken the memory of one dead, or the reputation of one who is alive, and expose him to public hatred, ridicule, and contempt."  Com. v. Clap, 4 Mass. 168; Ryckman v. Delavan, 25 Wend. 198.  In the present case the obvious and necessary effect of the publication was to expose the plaintiff to public ridicule and contempt, and it was, therefore, libelous.  It refers to the plaintiff by name, and manifestly is a publication "of and concerning" him.

"A writing published maliciously, with a view to expose a person to contempt and ridicule is undoubtedly actionable." Steele v. Southwick, 9 Johns. 214. In a case like this the law presumes malice, and evidence of express malice is unnecessary. Fry v. Bennett, 5 Sandf. 54; Klinck v. Colby, 46 N. Y. 431, 7 Am. Rep. 360.

On the trial, however, the plaintiff was permitted to prove, under objection and exception, that on a certain occasion one Fryer produced a copy of the paper containing this article, and in the presence of the plaintiff and others gave his interpretation of its meaning in words that must have been exceedingly offensive to the plaintiff. The evidence thus admitted is in substance that Fryer accused the plaintiff of being at Coney Island with a prostitute and being arrested there, stated that he could prove it, and for that purpose produced the paper containing this article. This evidence was admitted by the learned trial justice for the purpose, as stated by him, of indicating "how the article was interpreted, and to whom it referred." This we think was error. In People v. Parr, 42 Hun, 314, it was held that testimony of a witness that he recognized from the article that the plaintiff was the person to whom it referred was improper, and in Stokes v. Association, 66 App. Div. 569, 73 N. Y. Supp. 245, it was held that where the article does not refer to the plaintiff by name he may give proof showing that the particular circumstances adverted to in it are descriptive of him and his surroundings, but that he is not entitled to inquire of a witness whether from the article itself he identified the plaintiff as the person referred to. In both of these cases the reason of the rule is stated to be that if this kind of testimony is admitted the defendant might call witnesses to show that they did not recognize the plaintiff as the person referred to, and that "such testimony would be manifestly improper." In the present case the plaintiff was referred to by name and as "of Albany, N. Y.," where he had a place of business, yet he was permitted not only to prove that a person, who was not called as a witness, understood the article as referring to the plaintiff, but also to give the interpretation of this third person as to its meaning. The reason given in the cases above cited for holding the evidence improper, when directed to identity in cases where the article itself does not specifically name the person libeled, applies with equal force to direct evidence as to how others understood it, for, if the plaintiff may call witnesses to prove their understanding in this respect, certainly the defendant may do so. The error is even more vicious when a witness is allowed as in this case to state the interpretation that a third person who is not produced as a witness, and who is proved to be unfriendly to the plaintiff, put upon the article. Clary-Squire v. Press Pub. Co., 58 App. Div. 362, 365, 68 N. Y. Supp. 1028. The case of Stafford v. Association, 68 Hun, 467, 22 N. Y. Supp. 1008, is not in conflict with these views. In that case the article complained of was an advertisement the intended and necessary effect of which was to cause persons to address letters to the plaintiff and to call on her with reference to the matters advertised. Under these circumstances the court admitted proof that letters were sent to the plaintiff and that persons called on her to her annoyance, and this was sustained. It was proper in that case to show that the advertisement produced the

effect directly intended to be produced by it, but that is quite different from permitting a witness to testify to whom he understood it to refer, or what he understood it to mean. We cannot say that in this case the evidence was harmless. On the contrary it is more than likely to have had great weight with the jury on the question of damages. It is sufficient, however, that this evidence may have affected the verdict, and therefore the error in admitting it cannot be disregarded. Erben v. Lorillard, 19 N. Y. 302.

The judgment must be reversed, and a new trial granted, with costs to the appellant to abide the event. All concur; PARKER, P. J., and CHASE, J., in result.